*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
DALY, KIRKBY, and GROSS
Appellate Military Judges

———————————

**UNITED STATES**
*Appellee*

**v.**

**Steven G. FLORES**
Missile Technician Petty Officer First Class (E-6), U.S. Navy
*Appellant*

**No. 202300290**

———————————

Decided: 17 June 2025

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Rachel E. Trest

Sentence adjudged 29 July 2023 by a general court-martial tried at Naval Air Station Jacksonville, Florida, consisting of members with enlisted representation. Sentence in the Entry of Judgment: confinement for life with the possibility of parole and a dishonorable discharge.[1]

For Appellant:
*Ms. Catherine M. Cherkasky, Esq* (argued)
*Lieutenant Colonel Matthew E. Neely, USMC (*on brief*)*
*Lieutenant Meggie C. Kane-Cruz, JAGC, USN* (on brief)

---

[1] Appellant was credited with 376 days of pretrial confinement.

*18 June 2025:  Administrative Correction to reflect correct spelling of
Appellant's first name*

For Appellee:
*Lieutenant Stephanie N. Fisher, JAGC, USN* (argued)
*Lieutenant Colonel Candace G. White, USMC (on brief)*

Senior Judge GROSS delivered the opinion of the Court, in which Chief Judge DALY and Senior Judge KIRKBY joined.

––––––––––––––––––––

**PUBLISHED OPINION OF THE COURT**

––––––––––––––––––––

GROSS, Senior Judge:

A general court-martial composed of members with enlisted representation convicted Appellant of one specification of raping his nine-year-old daughter on divers occasions with his fingers and one specification of raping his daughter with his penis in violation of Article 120b, Uniform Code of Military Justice (UCMJ).[2] The panel sentenced him to be confined for life with the possibility of parole and a dishonorable discharge.[3] Significant to Appellant's conviction were his statements made during an interrogation by the Naval Criminal Investigative Service (NCIS). These statements were taken after Appellant had already been arrested by the State of Georgia for the same allegations. Appellant had previously invoked his right to remain silent and right to counsel with Georgia investigators, and had retained civilian counsel to represent him in civilian court proceedings.

Appellant raises four assignments of error which we restate as follows:

(1) whether the military judge abused her discretion in failing to suppress Appellant's statements after he invoked his right to counsel in violation of the Fifth Amendment to the Constitution and Military Rule of Evidence (Mil. R. Evid.) 305(c)(2);

(2) whether the military judge abused her discretion in failing to suppress Appellant's statements after he invoked his right to counsel in violation of the Sixth Amendment to the Constitution and Mil. R. Evid. 305(c)(3);

––––––––––––––

[2] 10 U.S.C. §120b.

[3] Appellant was credited with 376 days of pretrial confinement.

2

(3) whether Appellant's conviction for rape by digital penetration is legally and factually sufficient; and

(4) whether Appellant's trial defense counsel were ineffective for failing to argue that his wife could have planted his DNA on the victim.[4]

We find that the military judge did not abuse her discretion in admitting Appellant's interrogation, and that Appellant's convictions are legally and factually sufficient.

## I. BACKGROUND

*1. Facts of the case*

On 19 July 2022, Appellant's wife, Ms. Fox,[5] unlocked the primary bedroom in the house she shared with Appellant and their three children, and observed Appellant, naked, rolling over from his stomach to his back. She discovered their nine-year-old daughter, India, underneath the covers and naked from the waist down with her underwear on her lap. Ms. Fox immediately started to help India get dressed. As Ms. Fox was helping her, India said, "Daddy put his pee pee in me."[6] Ms. Fox took India to the hospital where she underwent a child forensic interview (CFI) and a sexual assault forensic examination (SAFE). During the CFI and SAFE processes, India reported further instances of abuse by her father dating back to when she was eight years old.

In the CFI, India stated that Appellant had done "nasty things," and that Appellant had raped her.[7] When asked what she meant by saying that Appellant had raped her, India said, "he pulled my pants down and did nasty stuff."[8] India reported during the SAFE, among other things, that Appellant "put his fingers inside my vagina."[9]

The hospital staff called the St. Mary's, Georgia, police department which coordinated with NCIS agents to take Appellant into custody. While India was

---

[4] Raised pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982). We have fully considered the matters raised by Appellant personally and find them to be without merit. *United States v. Matias*, 25 M.J. 356 (C.M.A. 1987).

[5] All names other than those of Appellant, judges, and counsel are pseudonyms.

[6] R. at 1218.

[7] App. Ex. XVIII at 27.

[8] *Id.* at 26.

[9] R. at 960, Pros. Ex. 24 at 6.

being treated at the hospital, NCIS agents, working with security onboard Submarine Base Kings Bay, Georgia, apprehended Appellant, and delivered him to the St. Mary's Police Department (SMPD). At the police station, NCIS Special Agent (SA) Delta witnessed SMPD Detective Charlie interrogate Appellant after reading him his rights in accordance with *Miranda v. Arizona*.[10] At the beginning of the interrogation, Appellant indicated he did not want to speak with authorities; however, Detective Charlie continued to question Appellant until Appellant invoked his right to counsel. During this interrogation Appellant made numerous admissions, including that he was naked in the bedroom with India, and that his wife had entered the room and accused him of sexually assaulting India.

When Appellant did invoke his right to counsel, Detective Charlie told Appellant that he was not free to go, and that there was someone else who needed to speak with him. SA Delta then approached Appellant and read him his rights under Article 31(b), UCMJ.[11] Appellant again invoked his right to counsel and SA Delta terminated her interview.

The Georgia state officials arrested Appellant on 19 July 2022 for multiple felonies, including: rape, sexual battery, and incest. Appellant appeared in magistrate court without an attorney on 21 July 2022 and waived his right to a preliminary hearing. On 5 August 2022, Mr. Gulf, a civilian lawyer retained by Appellant, filed a motion for a preliminary hearing and a motion for bail in magistrate court.[12] On 8 August, the court set a preliminary hearing for 24 August 2022.[13] Prior to the preliminary hearing, the district attorney's office tasked with prosecuting Appellant agreed to release Appellant into military custody for trial by court-martial.[14]

Special Agents Carter and Winters escorted Appellant back to Submarine Base Kings Bay, Georgia, where he was to be placed in pretrial confinement. Appellant was shackled and placed in the back of the car during the approximately 40-minute car ride. During the ride, SA Carter had the following text message exchange with a trial counsel:

---

[10] 384 U.S. 436 (1966).

[11] 10 U.S.C. § 831(b).

[12] App. Ex. XXVIII at 31-35.

[13] *Id*. at 36

[14] App. Ex XVI at 37.

| SA Carter: | He won't stop talking to us. We are minding 31B(sic) but any issues with us to try and interview a third time??? |
|---|---|
| RLSO TC: | Get him to waive in writing if you can |
| SA Carter: | Of course |
| RLSO TC: | Or do a recording of you advising and him waiving |
| | But no, no issues |
| | If you can record it, that would be awesome. He does have an attorney so be mindful of that[15] |

When they returned to the NCIS field office, the agents allowed Appellant to shower and then brought him into an interview room. Appellant's interactions with NCIS agents were audio and video recorded.[16] The agents entered the room at 09:29, and they engaged him in small talk, including whether he had been comfortable on the car ride to the NCIS office. Less than six minutes after the agents entered the room, and after they discussed things such as Appellant's hygiene accommodations in civilian confinement, Appellant asked, "So what's next?"[17] The agents told Appellant that they would need to complete some paperwork and then take him to the hospital to be checked out.

For nearly 20 minutes the agents engaged in small talk with Appellant regarding his family in Texas, bars and restaurants in Texas, his exercise regimen in civilian confinement, his career in the Navy, and other matters not related to the investigation. Then, SA Carter told Appellant, "I appreciate you sharing all that stuff with us. Like, I think your family needs you...And the best way to do that is, you know, stay in the Navy. Sounds like you're a good Sailor."[18]

Appellant nodded in response to these comments, and SA Carter then asked, "Would you be willing to talk to us about, you know, why you're jammed up here, telling us your side of the story?"[19] Appellant then responded without

---

[15] App. Ex. XXXII at 4.

[16] App. Ex. VIII.

[17] App. Ex. VIII at 119.

[18] *Id.* at 142.

[19] *Id.*

hesitation, "Well sure."[20] SA Carter then provided Appellant with a form listing his rights under Article 31(b), UCMJ. This form included a "cleansing warning" which stated, "Any prior illegal admissions or other improperly obtained evidence which incriminated me cannot be used against me in a trial by court-martial."[21]

As Appellant was reviewing the document, SA Carter explained "here are your rights. This is the most important thing. I want you to be completely informed before talking to us. I think St. Mary's said they already did this before, so nothing really new."[22] During the explanation, SA Carter twice referenced Appellant's attorney and indicated that Appellant could refuse to talk to the agents without his attorney present.

After SA Carter's explanation, Appellant immediately signed the form. SA Carter then asked, "Well, hold on. Did you – did you read these?"[23] Appellant then responded that he read the form while SA Carter was talking. SA Carter then told Appellant to initial by each of the rights if he understood them, and then asked, "And you want to talk to us? You don't want an attorney right now?"[24] Appellant then initialed the form and waived his rights.

Appellant then spoke with NCIS agents for about an hour. During the course of the interview, he made numerous statements that tended to corroborate the claims made by India and Ms. Fox. Among the admissions was a confirmation that the phrase "nasty things" meant sexual activity in the household. Appellant also repeated his admissions that he had been naked in his bedroom with India and that Ms. Fox had entered the room and accused him of sexual misconduct with their daughter. Appellant proceeded to make contradictory claims about his relationship with India and called her a liar who needed psychological help.

The Government initially charged Appellant with four specifications of violation of Article 120b, UCMJ, alleging rape of a child who had not attained the age of 12 years old. By the time of trial, the specifications put before the members included one specification of rape by penetrating India's vulva with

---

[20] *Id.*

[21] App. Ex. VIII at 201.

[22] App. Ex. VIII at 143.

[23] App. Ex. VIII at 144.

[24] *Id.*

his penis on 19 July 2022, one specification of rape on divers occasions by penetrating India's vulva with his penis between 2021 and 9 July 2022, and one specification of rape on divers occasions by penetrating India's vulva with his finger with an intent to gratify his sexual desires between 2021 and 9 July 2022.

### 2. *The Motion to Suppress*

Prior to trial, the Government filed a motion seeking a preliminary ruling on the admissibility of Appellant's statements. Trial defense counsel moved to suppress Appellant's statements to both SMPD and the NCIS agents. The parties provided relevant correspondence regarding the state transfer of Appellant to the custody of the military, and the state deferral of prosecution.[25] The Government also called SA Carter to testify.

SA Carter testified that NCIS initially acted in a supporting role to local law enforcement by locating Appellant on Submarine Base Kings Bay and transporting him to the SMPD headquarters. He testified about transporting Appellant from state custody to Kings Bay. And SA Carter testified that in preparation for the transport, he and SA Winters planned for the possibility that Appellant would want to talk either during or after the transport. However, SA Carter testified, "it was up to [Appellant] if he wanted to speak with us."[26]

According to SA Carter, once in the car, the agents offered to roll down the window, and Appellant "began talking about his situation."[27] SA Carter testified that Appellant discussed the conditions of his confinement including his treatment by other inmates. SA Carter testified that he responded to Appellant's comments by expressing empathy but that he did not seek to elicit any admissions or confessions.[28]

After the Article 39(a), UCMJ session, Appellant submitted an affidavit challenging the assertions made by SA Carter during his testimony.[29] Specifically, Appellant wrote that after being placed in the NCIS agents' vehicle, SA Winters asked if Appellant wanted to listen to the radio. Appellant stated he said "yes" and when asked what kind of music he liked to listen to he responded

---

[25] *See* App. Ex. VIII at 111; App. Ex. XVI at 35.

[26] R. at 29.

[27] R. at 30.

[28] R. at 31-32.

[29] App. Ex. XLIV.

"anything" and told the agents that he had not listened to any music during his time in confinement.[30] He then said "that place sucks" in reference to the jail.[31] Appellant further stated that, "During the car ride, both agents asked me questions about being in jail and about songs on the radio. I responded to their questions about the jail and the songs on the radio. At no time did I initiate conversation with the agents, but instead I responded to their questions and comments."[32]

Appellant also sought to have the military judge take judicial notice of the Uniform Rules, Magistrate Courts of the State of Georgia, Rule 7.1, for the proposition that Mr. Gulf's filing of a notice of appearance constituted an initiation of adversarial judicial proceedings. The Government opposed the Defense's request for judicial notice.

The military judge, having taken testimony and documentary evidence and having heard arguments of counsel, issued a detailed written ruling.[33] In this ruling, she addressed each of Appellant's claims that his interrogations on 19 July 2022 and 23 August 2022 violated the Fifth and Sixth Amendments of the Constitution. The military judge granted the Defense motion as it related to the 19 July 2022 interview by Detective Charlie, finding that Appellant had invoked his right to remain silent at the beginning of the interview and that Detective Charlie had not honored that invocation. However, she denied the Defense motion relating to the 23 August 2022 NCIS interrogation.

Regarding Appellant's claim that the agents had interrogated him in violation of his Fifth Amendment rights, the military judge gave greater credit to SA Carter's version of events than that of Appellant. She wrote, "although NCIS initiated speaking with [Appellant] regarding the conditions of the transport in the car...it was [Appellant] that expanded the conversation into more than just his current condition in the car, but began talking about what happened to him in the Camden County jail."[34]

The military judge then noted several other instances in which Appellant willingly engaged with SAs Carter and Winters during the recorded interview.

---

[30] *Id.* at 3.

[31] *Id.*

[32] *Id.* at 4.

[33] App. Ex. XLVII.

[34] *Id.* at 20.

At one point when SA Carter returned, Appellant asked the agents for some water and then asked SA Carter, "So what's next?"[35]

The military judge found that Appellant's repeated engagement with SAs Carter and Winters "could reasonably have been interpreted by NCIS as relating generally to the investigation..."[36] The military judge then found that Appellant, having reinitiated contact with the agents regarding the circumstances of his case, voluntarily waived his rights to silence and the presence of counsel under Article 31(b) and Mil. R. Evid. 305(e)(1) and (e)(3)(A)(i).

The military judge also found that SAs Carter and Winters did not violate Appellant's right to counsel under the Sixth Amendment and Mil. R. Evid. 305(c)(3). As an initial matter, the military judge noted that Appellant's charges were not preferred until 28 September 2022—over a month after his interrogation. Regarding Appellant's claim that he had a Sixth Amendment right to counsel for his state proceedings, the military judge said, "The Defense has failed to persuade this court that [the Uniform Rules, Magistrate Courts of the State of] Georgia Rule 7.1 states a notice of appearance or constructive equivalent is an initiation of adversarial judicial proceedings causing the Sixth Amendment right to assistance of counsel to attach."[37] Because she found that no preliminary hearing had occurred, "the Sixth Amendment did not attach in this case."[38] However, the military judge did not rest her ruling solely on this ground. She also considered whether Appellant's interrogation would be admissible under the dual sovereignty doctrine, and found that it would be admissible under that theory as well.

### 3. Trial Testimony regarding Specification 3 of the Charge

India was 10 years old by the time of trial and testified generally to Appellant's sexual abuse of her from the time she turned eight until 19 July 2022. She used euphemisms and slang in her testimony, describing her genitalia as her "front part" or "vagina" and his genitalia as his "front part" or "[d]***."[39] She described the charged sexual acts as "nasty stuff."[40]

---

[35] *Id.* at 21; App. Ex. VIII at 119.

[36] *Id.* at 22.

[37] *Id.* at 26.

[38] *Id.* at 26 n.4.

[39] R. at 865.

[40] R. at 877-85.

India described a series of sexual acts by Appellant from 2021 through July 2022, culminating in the events of 19 July 2022. During these descriptions she described what she saw, smelled, and felt when Appellant assaulted her. Unsurprisingly, due to her age, India did not differentiate between her vulva and her vagina, but rather used the term as a catch-all to describe her vulva, labia minora, labia majora, vaginal vault and vaginal vestibule. Toward the end of her direct examination, she engaged in the following colloquy with trial counsel:

> Q:      And by nasty stuff, where does his front part go?
>
> A:      In my front part.
>
> Q:      In your front part? And then similarly when he uses his finger, where does his finger go?
>
> A:      At my front part.
>
> Q:      At your front part.
>
> A:      Near or on it. I don't know how to say it.[41]

The Government also called Ms. Bravo, who had performed the SAFE on India. Ms. Bravo testified that as part of the SAFE, she would obtain a complete medical history including prior history of sexual assault. The military judge admitted Ms. Bravo's report of examination (without Defense objection to the relevant portions for this appeal), in which Ms. Bravo noted that India had told her, "[Appellant] put his finger inside my vagina."[42] India said that Appellant "licked inside my vagina" and pointed to her vagina.[43]

The members found Appellant guilty of raping India on 19 July 2022 with his penis, and guilty of raping India by digitally penetrating her vulva with his fingers on divers occasions. They acquitted Appellant of the specification that alleged that he had raped India on divers occasions with his penis.

---

[41] R. at 884-85.

[42] Pros. Ex. 24 at 6.

[43] *Id.*

## II. DISCUSSION

### A. The military judge did not abuse her discretion in finding that Appellant reinitiated questioning with NCIS on 23 August 2022.

*1. Law*

We review the military judge's denial of a motion to suppress Appellant's statements for an abuse of discretion.[44] "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion."[45] We will not disturb the military judge's findings of fact in ruling on a motion to suppress unless those findings are clearly erroneous.[46]

The Fifth Amendment is designed to protect an accused's rights both to remain silent and to have the assistance of counsel during an interrogation.[47] "An accused...having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."[48]

If an accused invokes his right to counsel during an interrogation "officials may not reinitiate interrogation without counsel present."[49] As the CAAF has said, however, "There is no blanket prohibition against a comment or a statement by a police officer after an invocation of rights. *Edwards* is designed to prevent the police from badgering a suspect. It does not prevent an individual from changing his or her mind and electing to speak with police."[50]

A divided Supreme Court held in *Oregon v. Bradshaw* that an accused who had invoked his right to counsel was deemed to have reinitiated communication with his interrogator when he asked, "Well, what is going to happen to me now?"[51] Justice Rehnquist, in the majority wrote "the respondent's question in

---

[44] *United States v. Chatfield*, 67 M.J. 432, 437 (C.A.A.F. 2009).

[45] *United States v. Jones*, 73 M.J. 357, 360 (C.A.A.F. 2014).

[46] *Chatfield*, 67 M.J. at 437.

[47] *See Miranda,* 384 U.S. 436.

[48] *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

[49] *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990).

[50] *United States v. Young*, 49 M.J. 265, 267 (C.A.A.F. 1998) (internal citations omitted).

[51] *Oregon v. Bradshaw*, 462 U.S. 1039, 1043-44 (1983).

this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation."[52]

The CAAF considered the *Edwards* and *Bradshaw* rule in the context of a request for permission to search in *United States v. Hutchins*. There the Court explained that "[t]he Edwards rule does not merely prohibit further interrogation without the benefit of counsel, it prohibits further "communication, exchanges, or conversations" that may (and in this case, did) lead to further interrogation."[53] Assuming, however, that a suspect does reinitiate with the police, the Supreme Court has held that the Government must still demonstrate a valid rights waiver.

> But even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.[54]

*2. Discussion*

We hold that the military judge did not err in concluding that the NCIS agents did not violate Appellant's Fifth Amendment right to counsel. In reaching her decision the military judge issued detailed findings of fact that we adopt as they are not clearly erroneous. In her findings, the military judge acknowledged that Appellant's version and that of SA Carter were inconsistent, particularly as to the nature of the conversation between the agents and Appellant during the drive from the Camden County jail. However, the military judge, who was in a position to judge SA Carter's credibility, specifically credited his version of events.

The military judge's findings are buttressed by the fact that the Government introduced text messages between SA Carter and trial counsel in which SA Carter said that "[Appellant] won't stop taking to us."[55] Additionally, after Appellant was brought to the NCIS headquarters, it was Appellant who first

---

[52] *Id.*

[53] *United States v. Hutchins*, 72 M.J. 294, 298 (C.A.A.F. 2013).

[54] *Bradshaw,* 462 U.S. at 1046 (quoting *Edwards*, 451 U.S. at 486, n.9).

[55] App. Ex. XXXII at 4.

brought up anything about the investigation, asking SA Winters whether he had come to the civilian jail to collect DNA samples previously.

Three minutes later, after SA Carter had returned, Appellant asked, "So what's next?"[56] The military judge concluded, and we agree, that this query by Appellant was very similar to *Bradshaw*'s query, "Well, what is going to happen to me now?" and demonstrated Appellant's willingness to engage in generalized discussion about the case.[57] Having reviewed the evidence including the videotape of Appellant's interrogation and the military judge's detailed findings of fact, we are satisfied that it was Appellant who first indicated a desire to speak about the offenses. Appellant's demeanor with the NCIS agents was easy and conversant. The agents did not badger him.

This case is distinguishable from *Hutchins* and other cases where military courts have found that it was law enforcement that reinitiated conversation with an accused. In *Hutchins*, the CAAF found that NCIS agents reinitiated conversation with Sgt Hutchins when they asked for permission to search his phone and used a form that reminded him that he remained suspected of offenses under the UCMJ. Here, the military judge weighed the controverted facts and found that the agents' conversations with Appellant were incidental to his transportation from civilian confinement back to military custody.

Even after Appellant asked, "So, what's next?" the agents did not immediately seek to question him, but rather engaged him on unrelated subjects.[58] Appellant argues that this "rapport building" was a ruse and an attempt to get Appellant to reinitiate. However, we agree with the military judge that Appellant showed a willingness to speak with the agents about the case long before the rapport-building session.

Finally, having concluded that the NCIS agents did not violate the *Edwards* rule, we must consider whether Appellant understood and voluntarily waived his rights under Article 31(b) and *Miranda* when presented with his notice and waiver of rights form. Here, the video evidence speaks for itself. When asked if he would be willing to speak with the agents, Appellant responds immediately, "well sure."[59]

---

[56] App. Ex. VIII at 119.

[57] *Bradshaw*, 462 U.S. at 1043-44.

[58] App. Ex. VIII at 119.

[59] Pros. Ex. 23; App. Ex. VIII at 142.

SA Carter then presented Appellant with the rights waiver form and repeatedly mentioned that Appellant could have his attorney present or terminate the interview. As the rights waiver form was being explained to Appellant, he signed it without hesitation. Appellant's actions were so quick and decisive that SA Carter asked him, "Well, hold on. Did you—did you read these?" Appellant confirmed that he did, and SA Carter again confirmed that Appellant understood his rights, that he wanted to talk to the agents, and that Appellant didn't want his attorney present.[60] We have no difficulty in concluding that Appellant's waiver was knowing, intelligent, and voluntary. Accordingly, the military judge did not err.

**B. The military judge did not abuse her discretion in finding that NCIS did not violate Appellant's Sixth Amendment right to counsel.**

*1. Law*

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right to have the Assistance of Counsel for his defence."[61] The Supreme Court has held that "once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings. Interrogation by the State is such a stage."[62]

This rule is codified in Mil. R. Evid. 305, which states

> If an accused against whom charges have been preferred is interrogated on matters concerning the preferred charges by anyone acting in a law enforcement capacity, or the agent of such a person, and the accused requests counsel, or if the accused has appointed or retained counsel, any statement made in the interrogation...is inadmissible unless counsel was present for the interrogation.[63]

---

[60] App. Ex. VIII at 144.

[61] U.S. Const. amend. VI.

[62] *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (cleaned up).

[63] Mil. R. Evid. 305(c)(3). Rule 305(c)(3) maintains the rule established by the Supreme Court in *Michigan v. Jackson*, 475 U.S. 625 (1986) and overturned in *Montejo*, that requires interrogators to have counsel present for any interview after preferral of charges.

In *McNeil v. Wisconsin*, the Supreme Court held that the Sixth Amendment right to counsel is offense-specific, and "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings -- whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."[64] In rejecting a broad reading of the Sixth Amendment protections, the Supreme Court stated,

> the ready ability to obtain uncoerced confessions is not an evil but an unmitigated good...Admissions of guilt resulting from valid *Miranda* waivers are more than merely "desirable"; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.[65]

In *Michigan v. Harvey*, the Supreme Court also addressed the issue of whether a represented accused in a criminal case could reinitiate communication with police, and indicated that a defendant-initiated conversation would be admissible under the Sixth Amendment.[66] Although not central to its holding, the Court there stated, "the Sixth Amendment does not disable a criminal defendant from exercising his free will. To hold that a defendant is inherently incapable of relinquishing his right to counsel once it is invoked would be to imprison a man in his privileges and call it the Constitution."[67]

This principle has been codified in Mil. R. Evid. 305(e)(3)(B), which states,

> If an accused or suspect interrogated after preferral of charges as described in subdivision (c)(3) requests counsel, any subsequent waiver of the right to counsel obtained during an interrogation concerning the same offenses is invalid unless the prosecution can demonstrate by a preponderance of the evidence that the accused or suspect initiated the communication leading to the waiver.

---

[64] 501 U.S.171, 175 (1991) (internal quotation marks omitted) (internal citations omitted).

[65] *McNeil*, 501 U.S. at 181 (quoting *Moran v. Burbine*, 475 U.S. 412, 426 (1986) (internal quotation marks omitted)).

[66] 494 U.S. 344 (1990).

[67] *Id.* at 353 (citing *Adams v. United States ex rel. McCann*, 317 U.S. 269, 280 (1942) (internal quotation marks omitted). *See also Montejo v. Louisiana*, 556 U.S. 778 (2009) (overruling *Michigan v. Jackson*, 475 U.S. 625 (1986) and establishing the *Edwards* rule as controlling for both Fifth and Sixth Amendment claims).

The Sixth Amendment right to counsel is applicable to the States under the due process clause of the Fourteenth Amendment.[68] The Georgia Court of Appeals has stated that under Georgia criminal procedure and law, "an initial appearance hearing, although often not a critical stage of a criminal proceeding in its own right requiring the presence of a defense attorney, is a formal legal proceeding wherein the Sixth Amendment right to counsel attaches."[69]

In analyzing criminal defendants' rights under the Bill of Rights to the Constitution, the Supreme Court has, from time to time, incorporated concepts from one Amendment to another. This is seen especially in discussing the rights identified in the Fifth and Sixth Amendments. The dual sovereignty doctrine initially stood as an exception to the Double Jeopardy Clause of the Fifth Amendment that generally prohibits successive prosecutions for the same offense. In *Heath v. Alabama*, the Supreme Court explained that "[w]hen a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences.'"[70] Therefore, even if the state and federal statutes had the exact same elements, the federal government could lawfully prosecute an accused a second time for the same underlying conduct.

While the Supreme Court has repeatedly held that the dual sovereignty doctrine does not prohibit successive prosecutions under the Double Jeopardy Clause of Fifth Amendment to the Constitution, it has not yet ruled on whether the doctrine also applies when deciding if a finding of a Sixth Amendment violation in one court is relevant to the same Sixth Amendment claim in another. It has, however, provided strong dicta to that effect.

In *Texas v. Cobb*, the Supreme Court considered the Texas Supreme Court's application of the Sixth Amendment right to counsel when police questioned an accused about an offense that was inextricably related to an offense for which Cobb was already represented.[71] There, Cobb was charged with burglary of a residence and was represented on the burglary charge. Authorities later sought to question him with respect to the murders of a mother and child who lived in the house that he was alleged to have burgled. The detectives obtained a waiver of Cobb's *Miranda* rights but did not go through his counsel. The Texas Supreme Court reversed Cobb's conviction, finding that the burglary

---

[68] *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963).

[69] *Stone v. State*, 296 Ga. App. 305, 307 (2009) (internal citation omitted).

[70] 474 U.S. 82, 88 (1985) (internal citation omitted).

[71] *Texas v. Cobb*, 532 U.S. 162, 172 (2001).

and murders were inextricably related and that the detectives therefore violated Cobb's right to counsel under the Federal Constitution.

In reversing the Texas Supreme Court, the U.S. Supreme Court stated that the Sixth Amendment right only attached for charged offenses.[72] Elaborating, the Supreme Court incorporated its definition of what offenses would be covered from its double jeopardy caselaw, citing *Blockburger v. United States*.[73] The Court declared, "We see no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel."[74]

While the Supreme Court was not passing on the question of the dual sovereignty doctrine in *Cobb*, and has not considered the issue since, a majority of the federal circuits have considered the issue, with most finding that the Sixth Amendment is sovereign-specific.[75] However, Appellant points to a split in the circuits and argues that there are two circuits that have found a right to suppression under the Sixth Amendment and declined to apply the dual sovereignty under what he claims are similar circumstances.

In *United States v. Red Bird*,[76] the Eighth Circuit declined to apply the dual sovereignty doctrine in a case where Red Bird had been charged with rape in tribal court and was represented by counsel when federal agents interrogated him regarding those same allegations. When Red Bird was ultimately indicted on federal rape charges for the same allegations underpinning the tribal rape charges, he moved to suppress his statement. The Eighth Circuit affirmed the trial court's ruling suppressing the statement, saying, "We do not believe that it is appropriate to fully rely on double jeopardy analysis here. As stated, the tribal charge in this case initiated the federal investigation and proceedings,

---

[72] *Id*. at 172.

[73] *Id*. at 173 (citing 284 U.S. 299 (1932) ("the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not")).

[74] *Id*.

[75] *See United States v. Coker*, 433 F.3d 39, 45 (1st Cir. 2005); *United States v. Alvarado*, 440 F.3d 191 (4th Cir. 2006); *United States v. Avants*, 278 F.3d 510 (5th Cir. 2002); *Turner v. United States*, 885 F.3d 949 (6th Cir. 2018); *United States v. Warrington*, 78 F.4th 1158 (10th Cir. 2023); *United States v. Burgest*, 519 F.3d 1307 (11th Cir. 2008).

[76] 287 F.3d 709, 715 (8th Cir. 2002).

and the tribe and the U.S. worked in tandem to investigate the rape. Furthermore, tribal sovereignty is 'unique and limited' in character."[77] The court then found that the tribal charges and the federal charges were the same offense and affirmed the district court's suppression of Red Bird's statement.

Likewise, the Second Circuit declined to apply the dual sovereignty doctrine and affirmed a district court's suppression of statements made to state investigators in violation of the Sixth Amendment when federal prosecutors sought to introduce those statements in a subsequent federal prosecution.[78] The Second Circuit specifically declined to apply the dual sovereignty doctrine, stating:

> Where, as here, the same conduct supports a federal or a state prosecution, a dual sovereignty exception would permit one sovereign to question a defendant whose right to counsel had attached, to do so in the absence of counsel and then to share the information with the other sovereign without fear of suppression.[79]

The Second Circuit later clarified its holding in *Mills*, however, and declined to suppress statements made by an accused to federal officers in a federal investigation while state charges were pending. The court stated, "*Mills'* holding is limited to situations in which federal prosecutors seek to admit evidence obtained by state and local prosecutors in violation of the Sixth Amendment."[80]

### 2. Discussion

We start by noting that, while not briefed by the parties, Appellant's Sixth Amendment claim is disposed of by our decision that the military judge did not err in concluding that Appellant voluntarily reinitiated communication with SAs Carter and Winters as discussed in section II.A *supra*. Although the Supreme Court's language in *Michigan v. Harvey* and *Montejo v. Louisiana* is arguably dicta, both the Supreme Court's language and that set forth in Mil. R. Evid. 305(e)(3)(B) compel a resolution against Appellant's contention. Given that we find the trial judge did not err in denying Appellant's Fifth Amendment claim, the logical conclusion is that Appellant's reinitiation with SAs Carter

---

[77] *Id.* at 715 (citation omitted).

[78] *United States v. Mills*, 412 F.3d 325 (2d Cir. 2005).

[79] *Id.* at 330.

[80] *United States v. Worjloh*, 546 F.3d 104, 109 (2d Cir. 2008).

and Winters also made his statement admissible even if he was represented, and the right to counsel had attached under the Sixth Amendment.

However, because the military judge did not decide Appellant's Sixth Amendment claim under either *Michigan v. Harvey* or Military Rule of Evidence 305(e)(3)(B), we will also consider her rationale in admitting Appellant's interrogation. First, we consider the military judge's conclusion that Appellant had no Sixth Amendment right to counsel for his Georgia proceedings. While the Government urges that we find that adversarial proceedings had not been initiated in the Georgia state courts, we find the Government's analysis—and that of the military judge—to be conclusory and potentially contrary to precedent under Georgia law. As noted above, the Georgia Court of Appeals held that police who question an accused who has been represented at an initial appearance without the presence of counsel violated the Sixth Amendment right to counsel.

Here, the parties do not dispute that Appellant appeared at an initial hearing. Nor do they dispute that Appellant was not represented at that hearing. Finally, they agree that after that hearing, but before a formal preliminary hearing, Mr. Gulf, Appellant's retained civilian attorney, filed a motion for a preliminary hearing with the Georgia state court.

We can find little substantive difference between the accused in *Stone* and Appellant, despite the fact that the accused in *Stone* was actually represented at the initial appearance hearing, whereas Appellant's notice of representation was filed after the initial appearance hearing. This issue was neither briefed nor fully litigated below, and the military judge's first premise in her ruling is based on the conclusion that Appellant's Sixth Amendment right to counsel did not attach until the preliminary hearing. Based on *Stone*, we are skeptical of the military judge's conclusion that no Sixth Amendment right to counsel attached based on Mr. Gulf having been retained and having filed a motion for a preliminary hearing with the Georgia State Court. However, this skepticism need not detain us long.[81]

Notwithstanding the holding in *Stone*, the military judge also analyzed whether Appellant's interrogation would be admissible under the dual sovereignty doctrine. The military judge assumed that Appellant had a Sixth Amendment right to counsel for the Georgia charges, and she concluded that

---

[81] Because we resolve Appellant's assignment of error by finding that the military judge correctly applied the dual sovereignty doctrine to Appellant's claims, we need not, and do not, express an opinion here as to whether Appellant has a cognizable Sixth Amendment claim in any future potential prosecution by the State of Georgia.

the dual sovereignty doctrine would nevertheless permit the introduction of Appellant's interrogation. We agree.

We find the reasoning of the majority of federal circuits' application of the dual sovereignty doctrine convincing. We note at the outset that strict application of Mil. R. Evid. 305(c)(3) would not suffice to render Appellant's statement to law enforcement inadmissible. Under military law, the initiation of adverse criminal proceedings—i.e. the time at which the Sixth Amendment right to counsel attaches—occurs upon preferral of charges. The record is clear that charges in this case were not preferred until 28 September 2022—more than a month after Appellant's interrogation. Nor does the fact that Appellant had an attorney who was not informed prior to the interrogation, by itself, render his statements inadmissible under the CAAF's precedent in *United States v. Finch.*[82]

Appellant makes strong policy arguments against the application of the dual sovereignty doctrine. Specifically, Appellant points to the fact that one day after Appellant's initial interrogation and arrest—and several weeks before Appellant's interrogation by NCIS agents—the investigation became a joint investigation. The fact that NCIS agents and civilian law enforcement were sharing information and jointly investigating India's claims, Appellant argues, distinguishes this case from those cases where federal courts have applied the dual sovereignty doctrine. Appellant argues that dual sovereignty does not apply here because "there were never two separate sovereigns conducting independent investigations into [Appellant]."[83]

Despite Appellant's policy arguments, we are unconvinced. The Supreme Court's jurisprudence is clear that the Sixth Amendment right to counsel is *offense* specific, not *investigation* specific. Appellant's contention that we must consider the nature of the investigation is directly contrary to the facts considered by the Supreme Court in *Cobb* where the same investigators conducting the same investigation questioned Cobb about a separate offense. We must take the Supreme Court at its word when it pronounces that there is "no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel."[84] Here, the offenses for which Appellant was pending trial in Georgia are not the same as those for which he

---

[82] *United States v. Finch*, 64 M.J. 118, (C.A.A.F. 2006).

[83] Appellant's Brief at 53.

[84] *Cobb*, 532 U.S. at 173.

was convicted at court-martial. As a result, his interrogation without the presence of his counsel was not a violation given the fact that he was prosecuted by a separate sovereign and validly waived his right to counsel as discussed in section II.A, *supra*.

## C. Appellant's conviction for rape by digital penetration (Specification 3 of the Charge) is legally and factually sufficient.

### 1. Law

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[85] In conducting this analysis, "*all of the evidence* is to be considered in the light most favorable to the prosecution."[86]

For offenses that occurred after January 2021, Congress changed the standard for our review for factual sufficiency of an appellant's conviction under Article 66, UCMJ. The statute now requires that prior to considering whether a conviction is factually sufficient, an appellant "must identify a weakness in the evidence admitted at trial to support an element (or more than one element) and explain why, on balance, the evidence (or lack thereof) admitted at trial contradicts a guilty finding."[87] A general disagreement with the verdict is insufficient to meet this requirement.[88]

After an appellant makes such a showing, we may weigh the evidence and determine controverted questions of fact, subject to appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence.[89] If, as a result of this review, "we are clearly convinced that the finding of guilty was against the weight of the evidence, we may dismiss, set aside, or modify the finding, or affirm a lesser finding."[90]

---

[85] *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987) (citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

[86] *Jackson*, 443 U.S. at 319 (internal citations omitted).

[87] *United States v. Valencia*, 85 M.J. 529, 535 (N-M. Ct. Crim. App. 2024) (internal citations omitted), *rev. granted*, __ M.J. __ , No. 25-0089/MC, 2025 CAAF LEXIS 202 (C.A.A.F. Mar. 14, 2025) (mem.).

[88] *Id.*

[89] Article 66(d)(1)(B)(i)(I)

[90] Article 66(d)(1)(B)(iii).

In 2024, the CAAF addressed the changes to the standard of review under Article 66, UCMJ, and stated that the phrase "appropriate deference" in the statute affords this Court discretion to determine what level of deference is appropriate.[91] After giving the deference we believe is due to different evidence in the case, to find a conviction to be factually insufficient, we must decide that the evidence, as we have weighed it, is insufficient to sustain the conviction, and second, we must be clearly convinced of that decision.[92] In reviewing cases involving child victims we are mindful of the CAAF's observation that "[i]nconsistencies...are not uncommon when child abuse victims testify...[a]ny person who suffers from some type of traumatic experience, adult or child, may have difficulty relating that experience in a chronological, coherent and organized manner."[93]

Specification 3 of the Charge alleged as follows:

> In that Missile Technician First Class Petty Officer Steven G. Flores, USN, Trident Training Facility Kings Bay, on active duty, did, at or near St. Marys, Georgia, on divers occasions between on or about 20 April 2021 to on or about 19 July 2022, commit a sexual act upon his daughter, [India], a child who had not attained the age of 12 years, by penetrating [India's] vulva with his finger, with an intent to gratify his own sexual desire.[94]

Article 120b of the UCMJ in effect at the time of Appellant's misconduct provided that "any person subject to this chapter who, (1) commits a sexual act upon a child who has not attained the age of 12 years...is guilty of rape of a child..."[95] The term "sexual act" was defined as having the:

> meaning[] given [that] term in [Article 120(g)] of this title, except that the term "sexual act" also includes the intentional touching, not through the clothing, of the genitalia of another person who

---

[91] *United States v. Harvey*, 85 M.J. 127, 131 (C.A.A.F. 2024).

[92] *Id* at 132.

[93] *United States v. Jones*, 85 M.J. 80, 85 (C.A.A.F. 2024) (cleaned up) (internal citations omitted).

[94] The charge sheet.

[95] 10 U.S.C. 920b(a)(1).

has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.[96]

In *United States v. English*,[97] the Army Court of Criminal Appeals (ACCA) reviewed the factual sufficiency of a rape specification where the government had alleged that Specialist English had raped a woman by force, with the force alleged as grabbing the victim's head with his hands. The ACCA concluded that while the government had not proved that Specialist English grabbed the victim's head with his hands, there was sufficient evidence otherwise to prove that Specialist English had committed the charged sexual act by unlawful force.[98] The ACCA therefore affirmed the finding of rape but excepted the language "to wit: grabbing her head with his hands" and affirmed the conviction based on the remaining language of the specification.[99]

On review, the CAAF reversed. Writing for a unanimous court, Judge Ryan found that the ACCA's decision was a violation of both Article 66, UCMJ, and Specialist English's due process rights. Judge Ryan explained that nothing in Article 66 permitted the ACCA to "except language from a specification in such a way that creates a broader or different offense than the offense charged at trial."[100]

The language of Article 66 in effect at the time of CAAF's decision in *English* read as follows:

> In a case referred to it, the Court of Criminal Appeals may act only with respect to the findings and sentence as approved by the convening authority. It may affirm only such finding of guilty and the sentence or such part or amount of the sentence as it finds correct in law and fact and determines, on the basis of the entire record, should be approved.[101]

---

[96] 10 U.S.C. 920b(h)(1).

[97] 78 M.J. 569 (Army Ct. Crim. App. 2018).

[98] *Id*. at 576.

[99] *Id*. at 577.

[100] *United States v. English*, 79 M.J. 116, 121 (C.A.A.F. 2019) (internal citation omitted).

[101] 10 U.S.C. 866(c) (2012).

As Judge Ryan noted, if the ACCA determined that it could not approve the findings as adjudged, its options were to "(1) set aside the findings … or (2) affirm a lesser included offense."[102]

With regard to lesser included offenses, the CAAF has already provided guidance regarding potential lesser included offenses in cases involving allegations of penetrative sexual offenses. "Abusive sexual contact is an LIO of aggravated sexual assault in some instances. For example, if an accused is charged with aggravated sexual assault by penetrating the genital opening of another, then any penetration of the genital opening would also require a touching of the genital opening."[103]

*2. Discussion*

Appellant argues that his conviction for rape as alleged in Specification 3 is legally and factually insufficient because India never testified that Appellant penetrated her vagina with his fingers. The Government responds that the guilty findings to Specification 3 are factually and legally sufficient because a) the SANE report includes India's claim that "daddy put his fingers inside my vagina," and b) that India testified that Appellant rubbed on her "front part" which she had previously described as her vagina. According to the Government, because India had described her "front part" as being her vagina, this testimony necessarily meant that India was describing the act of penetration, since the vagina is internal to the vulva.

We find Appellant's conviction for this offense to be legally sufficient. Under the highly deferential standard for legal sufficiency in which we must draw all inferences in favor of the prosecution, a reasonable fact finder could have found all elements beyond a reasonable doubt. The SANE report was offered for the truth of the matters asserted and provided evidence of penetration in specific terms. The admission of this evidence alone is enough to satisfy our legal sufficiency review.

However, our consideration of factual sufficiency is less deferential than that of legal sufficiency. As we stated in *Valencia*, we must first consider whether Appellant has identified "a weakness in the evidence admitted at trial to support an element."[104] Here, we will assume without deciding that Appellant has made such a showing.

---

[102] *English*, 79 M.J. at 121 (citing Articles 66(c) and 59(b)).

[103] *United States v. Wilkins*, 71 M.J. 410, 413 (C.A.A.F. 2012).

[104] 85 M.J. at 534.

Unsurprisingly, India did not describe Appellant's actions with specificity, and she did not use anatomically correct language or descriptions for what happened to her. Of course, appellate courts have long recognized that testimony of child victims may frequently have inconsistencies.[105] They may also lack the specificity of adult testimony.

We start by noting that we are to give "appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence." The question before us is whether India's apparently divergent testimony when discussing what Appellant did with his penis and, what he did with his finger, causes us, having weighed the testimony and evidence, to (1) find that Appellant's conviction for this specification to be against the weight of the evidence, *and* (2) to be clearly convinced of that finding.

The CAAF specified that when weighing the evidence, the quantum of proof needed to sustain a finding of guilty under the new standard in Article 66 did not change and remains proof beyond a reasonable doubt. What the CAAF did not explain is how a court of criminal appeals could find a conviction to be against the weight of the evidence (i.e., not beyond a reasonable doubt), and yet not be clearly convinced of that finding.[106] We think that the answer to that question comes in the deference we afford the trial court.

In other words, if we were to review the evidence ourselves in the first instance, we might find reasonable doubt based on the weight we afford certain evidence or lack thereof. However, because we give appropriate deference to the trial court, a doubt that may have been reasonable under that weighing might be unreasonable based on the weight of the countervailing evidence.

Here, Appellant rightly notes that India used two different ways to describe the sexual acts Appellant committed with his penis and his fingers. One way to evaluate that discrepancy may be to say that she described separate and exclusive acts (and therefore did not describe an act of penetration with the fingers); however, an equally plausible answer is that India simply did not have the vocabulary to adequately describe Appellant's penetration of her vulva (however slight). Given the admission of the SAFE, which contained a clear description of an act of penetration, and the deference we afford the trial court, we conclude that the Government met its burden and that Appellant's conviction for Specification 3 of the Charge is not against the weight of the evidence.

---

[105] *See generally United States v. Cano*, 61 M.J. 74, 77 (C.A.A.F. 2005).

[106] *Harvey*, 85 M.J. at 132.

All of this discussion, however, would be surplusage had the Government elected to charge Appellant with rape of a child using the definition of that charge as set forth in Article 120b. The Government was not required to prove that Appellant penetrated India's vulva under the expanded definition of sexual act within the statute, and would have pleaded and proved the charge of rape of a child simply by showing that Appellant touched India's genitalia, not through the clothing, with the intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

While the question of whether Appellant penetrated India's vulva with his fingers is one that causes us to consider the impact of the new Article 66 factual sufficiency standard on our authority to approve the findings in this case, there is simply no question that Appellant committed a lewd act on India. We base this finding on India's testimony (which the members clearly believed), the corroborating physical evidence from the 19 July 2022 rape which included physical injuries to India's vulva, the presence of DNA in India's vaginal vestibule that was consistent with Appellant's paternal lineage, and Appellant's rather damning interview with NCIS. This interview included admissions to key parts of the testimony of Ms. Fox and India along with inconsistencies and claims that tended to show a consciousness of guilt on Appellant's part.

Assuming, *arguendo*, that the Defense's position with respect to the factual sufficiency of the act of penetration is correct, we would have to consider whether we may affirm any finding of guilty with respect to this specification when considering the CAAF's precedent in *English* and *United States v. Lubasky*[107] and their progeny. We conclude that we could affirm the offense of rape of a child but strike the word "penetrating" and substitute therefor the words "touching, not through the clothes."

We base our reasoning on the following. First, we note that even at the time that *English* and *Lubasky* were decided, this Court had authority under Articles 59 and 66, UCMJ, to affirm a lesser included offense. Because a contact offense can be, and would be, a lesser included offense in this case, we find support in the dicta of *Wilkins* to find that at a minimum we could affirm the lesser included offense of sexual abuse of a child.[108]

---

[107] 68 M.J. 260, 265 (C.A.A.F. 2010) (explaining that findings by exceptions and substitutions could not be made on appeal under the law in place at the time).

[108] Under 10 U.S.C. 920b, the elements of sexual abuse of a child are: (1) that the accused committed a lewd act (2) upon a person who had not attained the age of 16 years old. "Lewd Act" is defined as including "any sexual contact with a child."

The scope of our authority is a legal question that we review de novo.[109] We find that the specific concerns that the CAAF had regarding the Army's lack of authority in *English* either do not exist here or no longer exist in light of Congress's changes to Article 66. We note that the CAAF explicitly held that its decision in *English* did not call into question the authority of a CCA to narrow the scope of language in a specification to affirm only so much as is correct in law and fact.[110] As noted above, any penetration of India's vulva by Appellant's fingers would necessarily have also required Appellant to contact India's vulva, not through the clothing.

Second, we construe Congress's change to Article 66 to permit us to not only affirm a lesser included offense, as was previously authorized in Article 59(b), UCMJ, but also to make changes to the specification so long as to do so does not violate Appellant's due process. The CAAF considered the language of Article 66 as it existed at the time and noted that nothing within the statute authorized the ACCA in *English* to except the method of force alleged—even though such allegation was unnecessary—finding that the only authority that ACCA had was to disapprove the findings or to affirm a lesser included offense.

Article 66 now authorizes a CCA to "dismiss, set aside, *or modify* the finding, or affirm a lesser finding." We find that Congress's inclusion of the phrase "or modify the finding" removes the underpinnings of the CAAF's holding in *Lubasky* and authorizes us to affirm a finding of rape by removing the surplus aggravating language included in Specification 3.

Finally, we find that a modification of the finding of guilty to Specification 3 under the circumstances in this case would not violate Appellant's due process rights. We distinguish this case from *Dunn* and *English* and find that Appellant was necessarily on notice that he had to defend not only against the allegation that he penetrated India's vulva with his finger to arouse or gratify his lust, but also that he necessarily would have to defend against a claim that he contacted her vulva with his finger with the same *mens rea.*

In *Dunn*, the Supreme Court held that the Tenth Circuit could not substitute a false declaration made during a hearing on a separate date for a false declaration made at a private attorney's office over one month prior that did not meet the definition of a proceeding under Title IV of the Organized Crime Control Act of 1970. In so holding, the Court noted that

---

[109] *See United States v. Bennitt*, 74 M.J. 125 (C.A.A.F. 2015).

[110] 79 M.J. at 122 n.5.

> To uphold a conviction on a charge that was neither alleged in
> an indictment nor presented to a jury at trial offends the most
> basic notions of due process. Few constitutional principles are
> more firmly established than a defendant's right to be heard on
> the specific charges of which he is accused.[111]

Similarly, in *English*, as previously discussed, the CAAF held that because the government had elected to charge a specific type of force used by the appellant, the ACCA was precluded from affirming his conviction on a theory of force not alleged in the charge sheet.

In this instance, if we were to change the nature of the offense from one involving penetration to one of contact, we would neither change the entire circumstances of the charged event as the Supreme Court found happened in *Dunn*, nor would we broaden the nature of Appellant's misconduct as the CAAF held happened in *English*. Rather, a modification here would simply affirm a finding of guilty to an offense that our superior court has already noted would be a lesser included offense with an adult victim. The end result under the facts of this case and the language in Article 120b would be an affirmed finding of guilt to rape of a child.

As a result, although we find that the Government proved Appellant's guilt to Specification 3 as charged beyond a reasonable doubt, assuming *arguendo* that the divergent nature of India's in-court testimony would have convinced us of the lack of factual sufficiency as to Appellant's digital penetration, we would still affirm Appellant's conviction as there is overwhelming evidence that he committed each of the elements of rape of a child.

---

[111] *Dunn v. United States*, 442 U.S. 100, 106 (1979).

### III. CONCLUSION

After careful consideration of the record and briefs and argument of appellate counsel, we have determined that the findings and sentence are correct in law and that no error materially prejudicial to Appellant's substantial rights occurred.[112]

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[112] Articles 59 & 66, UCMJ. 10 U.S.C. §§ 859, 866.